**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

Case No.  11-35468

EVANS COAL CORP.

        Debtor


**MEMORANDUM ON MOTION FOR RELIEF FROM
AUTOMATIC STAY AND ON TRUSTEE'S MOTION TO ASSUME LEASE**


**APPEARANCES:**    FRANTZ, McCONNELL & SEYMOUR, LLP
        Michael W. Ewell, Esq.
        Kevin A. Dean, Esq.
        Post Office Box 39
        Knoxville, Tennessee  37901
        Attorneys for David H. Jones, Chapter 11 Trustee

        JAMES R. GOLDEN, ESQ.
          1914 Cumberland Avenue
          Middlesboro, Kentucky  40965
          Attorney for Bradley S. Smith and Susan D. Smith

        MOORE & BROOKS
          James R. Moore, Esq.
          6207 Highland Place Way
          Suite 203
          Knoxville, Tennessee  37919
          Attorneys for Debtor

        SAMUEL K. CROCKER, ESQ.
        UNITED STATES TRUSTEE
          Patricia C. Foster, Esq.
          Howard H. Baker, Jr. United States Courthouse
          800 Market Street
          Suite 114
          Knoxville, Tennessee  37902
          Attorney for United States Trustee


**RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE**

These contested matters are before the court on the following: (1) Motion for Relief from the Automatic Stay, or in the Alternative, for Adequate Protection (Motion for Stay Relief) filed on March 21, 2012, by Bradley S. Smith and Susan D. Smith (the Smiths), seeking relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) (2006) to allow them to terminate their lease agreement with the Debtor or, in the alternative, seeking adequate protection; and (2) Motion to Assume Unexpired Lease of Real Property with Bradley S. Smith and Susan D. Smith (Motion to Assume Lease) filed by David H. Jones, Chapter 11 Trustee (Trustee), on July 19, 2012, seeking authority to assume the Debtor's unexpired lease with the Smiths.

An evidentiary hearing on the Motion for Stay Relief and the Motion to Assume Lease was held on December 4, 2012. The record consists of Stipulations of Fact (Stipulations) filed by the parties on October 29, 2012, fourteen exhibits admitted into evidence, and the testimony of four witnesses, Dwayne Taylor, Ted Helms, Bradley S. Smith, and the Trustee. Following the trial, the parties requested and were granted additional time to file supplemental briefs addressing the argument, raised for the first time by the Smiths' attorney during closing argument, that the Coal Lease Agreement between the Smiths and the Debtor had terminated pursuant to paragraph 3 defining the term of the lease as being "five (5) years from the date hereon or until all mineable and merchantable coal has been mined and removed from the leased premises, whichever first occurs." TRIAL EX. 1 at ¶ 3. The Smiths filed the Supplemental Post-Hearing Brief of Bradley S. Smith and Susan D. Smith on December 11, 2012, and the Trustee filed the Supplemental Post-Hearing Brief of David H. Jones, Trustee on December 18, 2012.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (G), and (O) (2006).

2

I

The Debtor filed the Voluntary Petition commencing this Chapter 11 case on December 7, 2011. Following a hearing on December 22, 2011, David H. Jones was appointed the Chapter 11 Trustee and has acted in that capacity from that date. The Debtor, which holds surface coal mining permit #807-0385, formerly #807-0329 (Mining Permit #807-0385) issued by the Commonwealth of Kentucky, Department of Surface Mining, entered into a Coal Lease Agreement with the Smiths on May 17, 2005, under the terms of which it was granted exclusive rights and privileges to mine coal on 189 acres of real property owned by the Smiths located at the head of Wilson Hollow in Bell County, Kentucky, a portion of which is included within Mining Permit #807-0385 (Smith Property). TRIAL EX. 1; STIPS. at ¶¶ 1(a), 1(c). The Coal Lease Agreement contained an initial term of five years "or until all mineable and merchantable coal has been mined and removed from the leased premises, whichever first occurs," with an option to extend for three additional five-year terms so long as "(1) coal is actually being produced from the Leased Premises, or from nearby properties that are included with the Leased Premises in a valid mining permit issued by the State of Kentucky, and (2) Lessee is not in default of any provision of this Lease Agreement." TRIAL EX. 1 at ¶ 3; STIPS. at ¶ 1(b). Under the Coal Lease Agreement, a default occurs "[i]f Lessee fails to comply with the payments and conditions of this Agreement," at which time the Smiths have the option to give the Debtor written notice of the default and, if within sixty days the default is not cured or a good faith effort to cure has not been made, the Smiths have the option to terminate the Coal Lease Agreement. TRIAL EX. 1 at ¶ 9. The current term of the Coal Lease Agreement, as extended, expires on May 16, 2015.

On September 11, 2008, the Debtor, the Smiths, and Tri-Star Real Estate, LLC (Tri-Star) entered into a Wheelage Agreement with Nally & Hamilton Enterprises, Inc. (Nally & Hamilton) authorizing Nally & Hamilton to construct, operate, and maintain haulage roads over the real property owned by Tri-Star and the Smiths and leased by the Debtor. TRIAL EX. 11 at ¶¶ 1, 3-4. In exchange, Nally & Hamilton agreed to pay $0.15 per ton of coal hauled across the leased property from September 11, 2008 through September 10, 2013, each to the Debtor, the Smiths, and Tri-Star with a right by Nally & Hamilton to renew for three additional five-year terms. TRIAL EX. 11 at ¶¶ 2, 5. Since January 2012, the Debtor's bankruptcy estate has received $77,149.94 from Nally & Hamilton under the Wheelage Agreement, although payments will cease under that agreement with the December 2012 payment, to be paid in January 2013, when Nally & Hamilton vacates the adjoining property. *See* TRIAL EX. 12. The Trustee assumed the Wheelage Agreement pursuant to an Order entered on August 2, 2012.

In their Motion for Stay Relief, the Smiths argue that the Debtor was in default under the Coal Lease Agreement on the date of the bankruptcy filing and continues to be in default under the Agreement by failing to diligently develop and mine coal since May 2010, and because it was not operating in compliance with state and federal laws, as evidenced by notices of non-compliance by the Kentucky Department for Surface Mining Reclamation and Enforcement. *See* TRIAL EX. 1 at ¶¶ 6, 8. Because it has not cured the defaults, the Smiths argue that the Trustee has failed to comply with 11 U.S.C. § 365(d)(3) (2006), requiring performance under all unexpired leases until assumed or rejected, thereby entitling them to either relief from the automatic stay or adequate protection. With respect to the Motion to Assume Lease, the Trustee avers that the Smiths do not claim any

4

monetary defaults under the Coal Lease Agreement and that he is working diligently with regulatory authorities to cure or otherwise negotiate a resolution of the existing and/or ongoing violations and reclamation obligations, thus complying with the requirements of § 365(b)(1). Because the same issues are central to resolution of both motions, the court will address them together.

## II

The Trustee seeks to assume the Coal Lease Agreement pursuant to 11 U.S.C. § 365(a), which allows, with court approval, a trustee to assume any unexpired contract or lease held by the Debtor subject to certain requirements including, as relevant in this case, that the trustee has "timely perform[ed] all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected." 11 U.S.C. § 365(d)(3). Whether or not assumption or rejection should be allowed depends on "the surrounding circumstances":

> [A] bankruptcy court reviewing a trustee's . . . decision to assume or reject an executory contract [or lease] should examine [the document] and the surrounding circumstances and apply its best "business judgment" to determine if it would be beneficial or burdensome to the estate to assume it. In reviewing a trustee's . . . decision to assume an executory contract, then, a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee . . ., and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate.

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) (citing *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 43 (2d Cir. 1979)); *see also ReGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 319 (7th Cir. 2011) (holding that the court "reviews the debtor's business judgment with respect to the proposed

assumption to determine if it would be beneficial or burdensome to assume the . . . contract by evaluating whether assumption would serve the reorganization or whether it would take away funds available to other creditors."). In essence, "[t]he business judgment rule requires the estate to assume a contract only where doing so will be to its economic advantage." *In re Crescent Oil Co., Inc.*, 2010 WL 2721878, at *3, 2010 Bankr. LEXIS 2226, at *12 (Bankr. D. Kan. July 8, 2010) (citing *COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 383 (2d Cir. 2008)). Additionally, in requiring court approval, "Congress intended that courts 'insure that the trustee's [assumption of the contract] gives the other contracting party the full benefit of his bargain.'" *UAL Corp.*, 635 F.3d at 319 (quoting *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir. 1996) (quoting S. REP. No. 95-989, at 59 (1978), 1978 U.S.C.C.A.N. 5787, 5845; H.R. REP. No. 95-595, at 348 (1978), 1978 U.S.C.C.A.N. 5963, 6304-05)).

The Smiths oppose the Trustee's Motion to Assume Lease and, through their Motion for Stay Relief, seek relief from the automatic stay pursuant to 11 U.S.C. § 362(d) which provides, in material part, that after notice and a hearing, "the court shall grant relief from the stay provided under subsection (a) of this section [by a party in interest] . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest[.]" 11 U.S.C. § 362(d) (2006). "With respect to § 362(d)(1), the purpose of providing adequate protection is to insure that a creditor receives the value for which it bargained pre-bankruptcy." *In re DB Capital Holdings, LLC*, 454 B.R. 804, 816-17 (Bankr. D. Colo. 2011). In order to obtain relief from the stay for lack of adequate protection, the creditor must establish a *prima facie* case which demonstrates that the debtor owes a debt to the creditor, that the creditor possesses a valid security interest securing the debt, and that

6

the collateral securing the debt is declining in value while the debtor has failed to provide the creditor with adequate protection of its interest in the collateral. *In re Bushee*, 319 B.R. 542, 551 (Bankr. E.D. Tenn. 2004). In making its determination, the court considers "the nature of the creditor's interest in the property, the potential harm to the creditor as a result of the property's decline in value and the method of protection[,]" *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992), as well as "(1) the value of the interest; (2) the risk that the value of the encumbrance will decline; and (3) whether the debtor's adequate protection proposal protects value against such risks." *In re Cambridge Woodbridge Apts., LLC,* 292 B.R. 832, 841 (Bankr. N.D. Ohio 2003).

> The determination of whether a creditor's interest is adequately protected is not an exact science nor does it involve a precise arithmetic computation. Rather, it is pragmatic and synthetic, requiring a court to balance all relevant factors in a particular case, including the value of the collateral, whether the collateral is likely to depreciate over time, the debtor's prospects for a successful reorganization and the debtor's performance under the plan. Other considerations may include the balancing of hardships between the parties and whether the creditor's property interest is being unduly jeopardized. A secured creditor retains the right to 'adequate protection' of its collateral, which means it is entitled to have the value of its collateral maintained at all times, and it can obtain relief from the automatic stay and take back its collateral at any time if that interest is not adequately protected or for other 'cause.'

*Bushee*, 319 B.R. at 551-52 (internal citations omitted). "The concept of adequate protection was not[, however,] designed or intended to place an undersecured or minimally secured creditor in a better post-filing [position] than it was in before the stay," *In re Planned Sys., Inc.*, 78 B.R. 852, 862 (Bankr. E.D. Ohio 1987) (citations omitted), and the analysis is, therefore, unnecessary "unless there is a threat to the value of the encumbrance." *Cambridge Woodbridge Apts.,* 292 B.R. at 841. Once a creditor offers proof that the value of the collateral is declining, the debtor must either refute the evidence or prove that there are "sufficient protections in place to guard against it[,]" including,

among others, "the sufficiency of the equity cushion, period payments, additional liens, or a good prospect of a successful reorganization." *In re Panther Mtn. Land Dev., LLC*, 438 B.R. 169, 190 (Bankr. E.D. Ark. 2010). Here, the Smiths seek termination of the automatic stay to allow them to proceed with termination of the Coal Lease Agreement and take action necessary to recover possession of the leasehold estate.

At trial, the Trustee testified as to the steps that he has taken since being appointed, including how he has attempted to maximize the assets of the estate: equipment that he has been in the process of selling, mining permits of which five are marketable, and the Debtor's unexpired leases including the Coal Lease Agreement with the Smiths. With respect to the leases, the Trustee stated that he has assumed some and has rejected others that were more costly than beneficial to the estate but that he believes it is in the estate's best interest to assume the Coal Lease Agreement in order to continue receiving income derived from the Wheelage Agreement with Nally & Hamilton and to maximize the value of Mining Permit #807-0385 if and when coal prices rebound because the permit is more marketable with the Coal Lease Agreement than without it. The Trustee also argued that the Smiths are adequately protected because unmined coal is not depreciable except as dictated by market price, and that once market price increases, the coal can be mined at a profit. Additionally, the Trustee contends that the Smiths have been provided with adequate protection because, in the event the reclamation bonds are forfeited, the Commonwealth of Kentucky will use the proceeds to perform the required reclamation work. During his trial testimony, the Trustee did not specifically address the fact that Nally & Hamilton is ceasing its mining operations on the property adjoining the Smith Property as of December 2012, and that the estate is due to receive only one final payment under the

Wheelage Agreement in January 2013; however, he did state that by assuming the Coal Lease Agreement, the estate will, in his opinion, retain the value of a more marketable mining permit.

In support of their Motion for Stay Relief and in opposition to the Motion to Assume Lease, the Smiths contend that not only has the Debtor breached the Coal Lease Agreement but also that they have not received any royalty payments since May 2010, and they are not being adequately protected. As the bases for their requested relief, the Smiths first argue that the Debtor has breached paragraph 6 of the Coal Lease Agreement entitled "Compliance With Laws" which requires the Debtor to "conduct its mining operations in accordance with the laws, rules and regulations of the United States of America and the Commonwealth of Kentucky." TRIAL EX. 1 at ¶ 6. The Smiths also argue that because the Debtor has not mined on the property since May 2010, and approximately 69,000 recoverable clean tons of coal remain on the property, the Debtor is in breach of paragraph 8 of the Coal Lease Agreement, which provides as follows:

> **MINEABLE AND MERCHANTABLE COAL**.  Lessee agrees to diligently develop and mine all of the mineable and merchantable coal from the Leased Premises.  The term "mineable and merchantable coal" as used in this Lease means coal which can be mined and removed at a reasonable profit to Lessee in the prevailing coal market by Lessee's employment of modern and efficient methods of coal mining and preparation.  If a dispute arises between Lessor and Lessee as to whether or not certain of the coal reserves within the Leased Premises are mineable and merchantable, and the parties are unable to resolve the dispute, then, at the option of either party, the dispute shall be submitted to final, conclusive and binding arbitration, with the costs of arbitration to be shared equally by the parties.

TRIAL EX. 1 at ¶ 8. Based upon the foregoing breaches of the Coal Lease Agreement, the Smiths contend that the agreement may not be assumed pursuant to 11 U.S.C. § 365(b), which provides in material part:

>the trustee may not assume such . . . lease unless, at the time of assumption of such . . . lease, the trustee –
>
>>(A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
>>
>>(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such . . . lease, for any actual pecuniary loss to such party resulting from such default; and
>>
>>(C) provides adequate assurance of future performance under such . . . lease.

11 U.S.C. § 365(b).

The Trustee disagrees with the Smiths, testifying that the Coal Lease Agreement is not in default because it requires the Debtor to diligently develop and mine coal only when it can be mined and removed at a reasonable profit in the prevailing coal market and that his investigation, since his appointment in December 2011, has led to the determination that coal cannot be mined and removed at a reasonable profit under current market conditions. In response, the Smiths argue that because the Trustee has acknowledged that no mineable and merchantable coal, i.e., coal that can be mined and removed at a reasonable profit, exists on their property, the Coal Lease Agreement has, by its own terms, terminated pursuant to paragraph 3 and cannot, therefore, be assumed.

"Where the primary purpose of a coal mining lease is to provide for the recovery of the mineral, the provisions of the lease are construed with that purpose in mind and, in the absence of clear language to the contrary, the parties will not be held to have intended that mining operations shall continue after it is established that mineable and merchantable coal was not found on the leased property or had been exhausted or dwindled to such an extent that it no longer was mineable at a profit[.]" *Bond v. Jackson County Coal Co.*, 106 F. Supp. 247, 252 (E.D. Ky. 1952) (citing *Auxier Coal Co. v. Big Sandy Coal Co.*, 238 S.W. 189 (Ky. Ct. App. 1922)). Accordingly, "the exhaustion of the mineable coal in the land under lease has the effect of terminating the contract, with the result that there is no obligation on the lessee to pay the minimum royalty thereafter." *Walter Bledsoe & Co. v. Elkhorn Land Co.*, 219 F.2d 556, 558 (6th Cir. 1955). "Under Kentucky law the term 'mineable and merchantable coal' has been found to be that which 'could be profitably mined by judicious methods.'" *Krypton Coal Corp. v. Golden Oak Min. Co.*, 383 S.E.2d 37, 40 (W. Va. 1989) (quoting *Auxier Coal Co.*, 238 S.W. at 191). In the context of coal, which "has to be mined in order to be placed on the market[,] . . . [merchantability] certainly includes the idea of workability. It cannot be merchantable if it is not workable. It would seem also to include the idea of being mined and sold at a profit. Of course, this does not mean in a time of acute depression, but under ordinary conditions." *Martin's Fork Coal Co. v. Harlan-Wallins Coal Corp.*, 14 F. Supp. 902, 907-08 (E.D. Ky. 1934).

Here, the court agrees with the Smiths that the Coal Lease Agreement has been terminated by its own terms. Paragraph 3 unequivocally provides for a renewable lease term of five years "or until all mineable and merchantable coal has been mined and removed from the leased premises,

whichever first occurs." TRIAL EX. 1 at ¶ 3. The term "mineable and merchantable coal" is defined within paragraph 8 to mean "coal which can be mined and removed at a reasonable profit to Lessee in the prevailing coal market by Lessee's employment of modern and efficient methods of coal mining and preparation." TRIAL EX. 1 at ¶ 8.

Neither party disputes that there is coal remaining on the Smith Property. The basis of contention is whether there is mineable and merchantable coal. As discussed, the Coal Lease Agreement itself defines that term as "coal which can be mined and removed at a reasonable profit to Lessee in the prevailing coal market by Lessee's employment of modern and efficient methods of coal mining and preparation." TRIAL EX. 1 at ¶ 8. As acknowledged by the Trustee, this paragraph does not require coal to be mined and removed at a reasonable profit to any company, but only applies to the ability of the Debtor, as Lessee, to do so. The Trustee testified unequivocally that he cannot, at the present time, mine and remove coal from the Smith Property at a reasonable profit, and his assessment was corroborated by the testimony of Mr. Helms, who discussed the range of costs and profitability margins, based on fuel and equipment costs, and other factors such as whether a company can sell directly to a utility or must sell to another coal company. It thus appears to the court that the parties are in agreement that the Debtor cannot mine the coal on the Smith Property "at a reasonable profit . . . in the prevailing coal market[.]" The Coal Lease Agreement has, therefore, pursuant to paragraph 3 terminated by its own terms.

Additionally, paragraph 6 of the Coal Lease Agreement requires the Debtor to "conduct its mining operations in accordance with the laws, rules and regulations of the United States of America and the Commonwealth of Kentucky." TRIAL EX. 1 at ¶ 6. As evidence of the Debtor's breach of

that paragraph, the Smiths offered into evidence five separate Notices of Non-Compliance issued to the Debtor by the Kentucky Division of Mine Enforcement and Reclamation for: (1) failing to maintain a sediment pond, (2) failure to maintain diversion ditches, (3) allowing off-permit disturbance, (4) failure to conduct contemporaneous reclamation, and (5) failure to submit quarterly water monitoring reports, as well as the testimony of Dwayne Taylor, an environmental inspector with the Kentucky Department of Natural Resources. *See* COLL. TRIAL EX. 2; COLL. TRIAL EX. 3; TRIAL EX. 4; TRIAL EX. 5; TRIAL EX. 6.

When questioned about the Notices of Non-Compliance, Mr. Taylor explained that each notice of non-compliance issued by the Department of Natural Resources could include more than one non-compliant standards code and that all mining permits are comprised of different increments to distinguish the property included therein, such as roads, ponds, etc. with, in this case, the Smith Property within Mining Permit #807-0385 having been designated as Increment #5. In reviewing each individual Notice of Non-Compliance, Mr. Taylor identified the specific standards codes that were not in compliance. As to the first Notice of Non-Compliance dated October 22, 2010, violations involving the Smith Property included sediment levels being too high, having breached or eroded diversion ditches, and the presence of materials and spoilage spilling onto areas outside the permit area. COLL. TRIAL EX. 2. Remedial work which was to have been completed by November 21, 2010 and March 28, 2011, respectively, was not completed as of April 13, 2011, and an Order for Cessation and Immediate Compliance was issued first on April 13, 2011, with a second issued on June 27, 2011, both with the directive that the Debtor "cease your present activities on the area described as follows: No mining activity is occurring on site at this time." COLL. TRIAL EX. 2.

The second Notice of Non-Compliance, dated May 18, 2011, states that the Debtor had "failed to achieve the required reclamation within the specified time frame after coal removal" and ordered reclamation by June 17, 2011. COLL. TRIAL EX. 3. An Order for Cessation and Immediate Compliance was then issued on July 25, 2011, directing that the remedial action previously ordered but not taken be done immediately. COLL. TRIAL EX. 3. The third Notice of Non-Compliance was issued on December 20, 2011, for not submitting the "quarterly instream, groundwater, and/or discharge monitoring reports for the 3rd quarter 2011 . . . as required by approved permit plans and regulations." TRIAL EX. 4. The fourth and fifth Notices of Non-Compliance dated March 19, 2012, and May 29, 2012, respectively, are also for failure to submit the water monitoring reports for the 4th quarter of 2011 and the 1st quarter of 2012. TRIAL EX. 5; TRIAL EX. 6. The fourth Notice of Non-Compliance is marked as "Non correctable because the deadline for submitting reports has already passed." TRIAL EX. 5. Similarly, the fifth Notice of Non-Compliance is deemed "Non-Correctable - because no data was sampled for January and February and the deadline for submitting reports has already passed." TRIAL EX. 6.

In support of his argument that the Debtor is not in default of the Coal Lease Agreement for non-compliance, the Trustee first argued that Mining Permit #807-305, which is cited in each of the Notices of Non-Compliance, has associated reclamation bonds secured by certificates of deposit and/or cash in the amount of $516,700.00 to secure the Debtor's performance of the reclamation obligations owed to the Commonwealth of Kentucky and that he is working diligently with inspectors and has hired an attorney in Kentucky to address the reclamation issues as to all of the Debtor's permits. He also testified that the problems with the water reports occurred because

14

Standard Labs, the company engaged by the Debtor to do the water testing, had performed testing in October and November 2011, but had not filed the reports or performed the testing at all for December because it had not been paid. The Trustee additionally testified that once he arranged for Standard Labs, which he re-engaged in February 2012, to be paid, the company once again began testing and submitting the required reports, and there have been no problems since. This testimony was corroborated by Mr. Taylor, who testified that all of the water monitoring reports are now being submitted; however, the Debtor may be required to pay a fine for the non-correctable violations. Finally, the Trustee testified that even though none of the field work to correct any of the foregoing land issues has yet to be done, the Debtor has engaged C & D Excavating to perform reclamation at the Smith Property, and once that is completed, the issues raised in the Notices of Non-Compliance will be abated.

Unquestionably, the Trustee inherited a number of problems when he was appointed, including non-compliance issues with the Commonwealth of Kentucky. The court recognizes that he has worked hard to establish a rapport with state inspectors and to establish that the Debtor is attempting in good faith to remedy its deficiencies. The Trustee has also engaged C & D Excavating to do reclamation work on the Smith Property, although that work has not yet begun. Paragraph 6 of the Coal Lease Agreement, however, requires that the Lessee "*shall* conduct its mining operations in accordance with the laws, rules and regulations of the United States of America and the Commonwealth of Kentucky." TRIAL EX. 1 at ¶ 6 (emphasis added). Notwithstanding the Trustee's efforts, the fact remains that the Debtor is not in compliance with the laws, rules, and regulations of the Commonwealth of Kentucky, has not been in compliance since at least October 2010, and

15

directives by the Commonwealth of Kentucky to take remedial measures have not been followed. *See* COLL. TRIAL EX. 2; COLL. TRIAL EX. 3; TRIAL EX. 4; TRIAL EX. 5; TRIAL EX. 6.

Additionally, the court does not agree that assumption of the Coal Lease Agreement would provide a tangible benefit to the estate. Notwithstanding that the coal is not "mineable and merchantable," the Trustee seeks to hold on to the Coal Lease Agreement in the event that coal prices rise, so that he may then try to market Mining Permit #807-0385 at a higher value. In support of his contention that it is in the estate's interest, the Trustee correctly testified that if the Coal Lease Agreement is not assumed, the estate will lose its entitlement to payments from Nally & Hamilton under the Wheelage Agreement. However, Mr. Helms also testified that Nally & Hamilton is leaving the sites at which it has been mining and is ceasing its mining in that area for a period of at least two to five years, so after January 2013, the estate is not due to receive any further payments under the Wheelage Agreement for that time period or until Nally & Hamilton decides to return to the sites. Accordingly, during that time period, the Coal Lease Agreement will provide the estate with no income but will continue to cause the estate to incur security and reclamation-related expenses. In essence, the Trustee's plans with respect to the Coal Lease Agreement involve speculation and contingencies – whether the price of coal will rise again, whether Nally & Hamilton will return to the site and begin making payments again under the Wheelage Agreement, whether the estate can market and sell Mining Permit #807-0385 – but do not involve any present action that will offer any benefit to the estate. The fact that the coal market has rebounded in the past is no guarantee that coal prices will rise in the near future, during which time, the estate will continue to

expend funds on the site.  Finally, were the Trustee to assume the Coal Lease Agreement, the sole result would be to hold the Smiths hostage to the vagaries of the coal market.

For the foregoing reasons, the Motion to Assume Lease filed by the Trustee will be denied, and the Motion for Stay Relief filed by the Smiths will be granted, notwithstanding that the Coal Lease Agreement has been terminated by its own terms, so that they may proceed with the recovery of their real property.

An Order consistent with this Memorandum will be entered.

FILED:  January 8, 2013

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE